IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CYNTHIA JAGIELSKI,

      Plaintiff,                         06cv1081

    v.                                   **ELECTRONICALLY FILED**

METROPOLITAN LIFE INSURANCE COMPANY,

      Defendant.

**MEMORANDUM OPINION**

**August 24, 2007**

    **I.    Introduction.**

    Even under the traditional "arbitrary and capricious" standard of judicial review of a denial of benefits by an independent third-party ERISA plan administrator to which a funding employer has granted discretionary authority to construe its terms and make benefits determinations, see *Nazay v. Miller*, 949 F.2d 1323, 1334 (3d Cir. 1991), a *more* arbitrary and capricious denial of disability benefits than the one before the Court is difficult to imagine.  It goes without saying, then, that under the "heightened arbitrary and capricious" standard of judicial review that the Court finds is required in this case, and the "high degree of skepticism" engendered by the many procedural irregularities, inherent inconsistencies and unreasonable analysis of plaintiff Cynthia Jagielski's uncontradicted medical record establishing her continuing disability as a result of fibromyalgia and chronic fatigue syndrome, MetLife's thoroughly arbitrary and capricious decision must be reversed, full back disability benefits must be awarded with interest, and attorneys fees must be assessed.

## II.     Factual and Procedural Background.

There is remarkably little dispute over the underlying facts, although the parties vigorously disagree over the inferences to be taken from those underlying facts.  Unless otherwise indicated, the following facts are undisputed.

Plaintiff Cynthia Jagielski was employed by Bell of Pennsylvania for many years, until April 26, 1993, when she became disabled from her job as a Sales and Service Representative, at which time her monthly salary was $2,784.  Plaintiff's Concise Statement of Material Facts (doc. no. 48), ¶ 1.[1]   As a Bell of Pennsylvania employee, plaintiff was a participant in a Long Term Disability ("LTD") Plan sponsored by Bell and administered by third party Mutual of Omaha. The Bell LTD Plan was amended on January 1, 2001 by Bell's successor in interest, Verizon Communications, Inc., and renamed the Verizon Disability Benefit Plan, which provided for short and long term disability benefits.  As of January 1, 2001, the Summary Plan Descriptions of the Verizon Plan[2] provided as follows:

---

[1] Representative of many of defendant MetLife's cagey responses to Plaintiff's Concise Statement of Material Facts, MetLife admits each of the facts asserted in ¶ 1, while stating that plaintiff's "characterization of the facts are denied." Defendant's Response to Plaintiff's Concise Statement of Material Facts ¶ 1.  Plaintiff's averments in ¶ 1 of her Concise Statement of Material Facts are, however, entirely factual and without "characterization" at all.  MetLife's Response to Plaintiff's Concise Statement of Material Facts is replete with similar examples of cageyness, some of the more noteworthy of which will be pointed out as we go along.

[2] The parties dispute which Plan governs plaintiff's disability claims, the Bell LTD Plan which was in effect at the time she first became eligible for such benefits, or the Verizon Plan, pursuant to which MetLife denied her LTD benefits in 2003.  The Court finds that the Bell Plan retained the right to amend its terms, and that the subsequent amendments to the Plan by Bell's successor in interest, Verizon, were effective as of January 1, 2001.  The Court will therefore refer to the Summary Plan Descriptions and definition of disability as set forth in the Verizon Plan.  In any event, the Court deems the differences in the disability related terms of the respective plans to be insignificant.

LTD benefits begin after you have received 52 weeks of Sickness Disability Benefits. To receive benefits you must meet one of the following conditions:

- You must be unable to work in any occupation or employment for which you are or may become reasonably qualified by training, education or experience.
- As a result of your disability, you are only able to work at a job that pays less than half of your basic pay rate at the time you became disabled.

In addition, you must be under the care of a qualified physician who must provide appropriate documentation of your disability.  You also must take proper care of yourself and receive proper medical treatment.  Otherwise, you will not be eligible for benefits.

Plaintiff's Concise Statement of Material Facts at ¶ 3 and Defendant's Response to Plaintiff's

Concise Statement of Material Facts at ¶ 3.

The definition of "Total Disability" in the glossary of the Verizon Plan's Summary Plan

Description states that under Verizon's LTD Plan, "you are considered to be totally disabled if

you are unable, due to sickness or injury documented by objective medical evidence, to perform

any job for which your are or may become qualified by reason of education, training or

experience, or any job that pays, on a full-time basis, 50 percent or more of your base pay."

Defendant's Response to Plaintiff's Concise Statement of Material Facts at ¶ 3.  The Verizon

Plan provides that "you can continue to receive LTD benefits until you no longer qualify as

disabled under the Plan or you die."  Defendant's Response to Plaintiff's Concise Statement of

Material Facts at ¶ 5.

On May 14, 1994, plaintiff submitted a claim to Mutual of Omaha for LTD benefits based

upon "fibromyalgia, chronic fatigue immune deficiency syndrome," after first exhausting 52

weeks of short term disability.  In a supplemental report of disability dated May 18, 1994,

plaintiff's treating physician, M.P. Kahn, M.D., confirmed the diagnoses of chronic fatigue immune deficiency syndrome and fibromyalgia. Plaintiff's Concise Statement of Material Facts at ¶ 8.[3]   Plaintiff's reported symptoms included constant pain, tiring easily, muscles that felt like they were filled with cement, tremors and "digestive problems." Plaintiff's Concise Statement of Material Facts at ¶ 9.[4]

By letter of May 13, 1994, Mutual of Omaha informed plaintiff that it had carefully considered her claim for LTD benefits on the basis of fibromyalgia and chronic fatigue syndrome, and approved monthly benefits in the amount of $1,392.00.  Mutual of Omaha also directed plaintiff to apply for Social Security Benefits, which she did.[5]  On September 11, 1996,

---

[3] In another typical example of its cageyness, defendant admits that plaintiff's treating physician, Dr. Kahn, "listed diagnoses of Fibromyalgia, Fatigue and Chronic Fatigue Syndrome on an Attending Physician Supplemental Statement . . . dated May 18, 1994[,]" but denies plaintiff's "characterization," i.e, that Dr. Kahn "confirmed these diagnoses."  If there is any distinction between "listed diagnoses of Fibromyalgia, Fatigue and Chronic Fatigue Syndrome on an Attending Physician Supplemental Statement . . . dated May 18, 1994" and "confirmed these diagnoses," it is one without a difference.  It is, moreover, a waste of judicial resources to have to take time to compare the "competing" statements to see if perhaps defendant is making a legitimate point.

[4] Defendant again disputes plaintiff's "characterization," presumably because she did not use the words "digestive problems" to describe her symptoms but "constipation or diarrhea." Defendant's Response to Plaintiff's Concise Statement of Material Facts at ¶ 9.

[5] Defendant continues its gamesmanship by disputing plaintiff's "characterization" that she in fact applied for Social Security Benefits, because the "Administrative Record at Bates Stamp Nos. 315-316 does not indicate whether plaintiff did so."   Defendant's Response to Plaintiff's Concise Statement of Material Facts at ¶ 11. While the "Administrative Record at Bates Stamp Nos. 315-316 does not indicate whether plaintiff" in fact applied for social security benefits, the Administrative Record at Bates Stamp Nos. 278-282 and elsewhere certainly proves the undisputed fact that plaintiff applied for, and received, a favorable determination of disability by the Social Security Administration.  MetLife cannot dispute that plaintiff received a favorable SSA determination, so she must have *applied* for social security benefits, *necessarily*.  Such gamesmanship is not helpful to the Courts, and counsel for defendant would be well advised to just stop it.

the Social Security Administration ("SSA") determined that plaintiff was disabled as of April 26,

1993, and was entitled to monthly Disability Insurance Benefits ("DIB") in the amount of

$642.10.  Pursuant to its terms, plaintiff's monthly LTD benefits under her disability Plan were

offset in the amount of her DIB, and MetLife, which had assumed administration of the LTD

Plan in 1995, notified plaintiff that her monthly LTD benefits would be reduced to $734.00.

Plaintiff also was required to reimburse the Plan over $14,000, which she promptly did.

Administrative Record ("AR") 115, 123-125.

In 1995, MetLife requested an attending physician's statement of functional capacity on

its own form, and Mrs. Jagielski submitted such form by Dr. Kahn, who continued to treat her as

her primary care physician.  Dr. Kahn noted a diagnosis of "progressive CFIDS," fatigue, joint

pains, fibromyalgia, viral symptoms, allergic rhinitis and muscle spasms, and his progress notes

indicated that her condition had "retrogressed." AR, 287-88.  Although MetLife denies plaintiff's

"characterization," it does not deny the facts averred in plaintiff's summary paragraph 17, and the

Court's review of the Administrative Record confirms the fairness and accuracy of plaintiff's

following summary:

> Over the ten year period that MetLife continued to pay her LTD
> benefits, MetLife periodically requested that Mrs. Jagielski provide an
> attending physician's statement of functional capacity on its own form.  In
> response to each request, Mrs. Jagielski submitted a statement, completed and
> signed by Dr. Kahn, noting the same diagnoses and restrictions and limitations
> as in 1995 and further noting no improvement in these conditions. (Adm. Rec.
> at 289-90 (dated 4/96) ("retrogressed" and 3 years of symptoms, no
> improvement, sometimes worse, progressive weakness of hands"); 269-70
> (dated 10/96) ("retrogressed" and 3 years of symptoms with no improvement,
> sometimes worse, weakness of hands"); 201 (11/21/96 lab tests results out of
> normal range); 208-09 (dated 10/29/97) ("retrogressed" and "no significant
> improvement in the last 4 years").

5

Plaintiff's Concise Statement of Material Facts at ¶ 17; Defendant's Response to Plaintiff's

Concise Statement of Material Facts at ¶ 17.

In January 1998, MetLife scheduled an independent medical examination ("IME") for

plaintiff with Dr. Noah Bass, M.D., a rheumatologist, for an "independent medical examination

regarding fibromyalgia." AR at 216, 235-36.  Dr. Bass physically examined plaintiff on January

26, 1998, and in his report written that same day, he took her oral history and medication history,

made "Objective" findings and observations including that plaintiff had "some very minimal

Heberden's nodes," "adequate range of motion at the wrists, elbows, shoulders," and

"tenderness" at many points along her cervical and thoracic spines and her "bursal regions."  AR

3-5.  From his interview and examination, Dr. Bass, the rheumatologist to whom MetLife had

sent plaintiff for an IME, made the following assessment:

> It is my impression that this patient is suffering with fibromyalgia and that she
> meets American College of Rheumatology criteria for this diagnosis.  she also
> suffers with kyphosis and scoliosis. . . .
>
> With regard to her ability to perform the regular duties of her job, she is not
> able to perform regular duties at this time.  I think that the main issue here is
> complete failure of any rehabilitation or attempt at rehabilitation . .  and that
> for hope of any realistic improvement in this patient she would need a
> prolonged course of rehabilitation, perhaps under the guidance of a pain clinic
> setting that works with a psychologist . . . .
>
> With regard to myalgia (myalgia just means muscle pain), she clearly has that.

AR at 3-5, 218-19.[6]

---

[6] A Registered Nurse/ Medical Review Specialist for MetLife reviewed Dr. Bass's report
and, on February 11, 1998, accepted his opinion (consistent with Dr. Kahn's diagnoses) that
plaintiff was "not able to perform regular duties of her job," AR 223, and MetLife continued to
pay LTD benefits.

Once again, MetLife denies plaintiff's "characterization" of Dr. Noah's report,[7] but not its substance, and MetLife also notes that Dr. Noah's report, which it had commissioned as is its right under the terms of the Plan, AR 79 ("Verizon or the benefits administrator may initially require you to see a physician of its choice and on a periodic basis thereafter. If you refuse to be examined by such a physician, you may be denied benefits."), "referenced minimal objective findings." Defendant's Response to Plaintiff's Concise Statement of Material Facts at ¶ 19.

Following her IME and Dr. Noah's report, plaintiff continued to comply with all requests by MetLife for updated functional assessment forms, and each time, had Dr. Kahn complete and sign MetLife's forms and return them to MetLife, and said forms showed no improvement from August 1999 through October 26, 2001. In his October 26, 2001 form, Dr. Kahn noted the same diagnoses of fibromyalgia, "CFS," fatigue and chronic pain, and "tenderness over motor points." Plaintiff's Concise Statement of Material Facts ¶ 20-21; AR at 462-63.

On June 25, 2002, MetLife informed plaintiff by letter that "the administration of your Long Term Disability (LTD) claim will be transferred from Lexington, KY to MetLife's disability claim office in Glastonbury, Connecticut. . . . [and that this] move does not impact the current LTD benefits you are or may be eligible to receive." AR at 461. (MetLife admits that the letter says what it says, but denies that it means what it says, i.e., that administration of her claim was transferred to another office. Defendant's Response to Plaintiff's Concise Statement of Material Facts at ¶ 22). Within a year, MetLife notified plaintiff that it was updating her LTD claim, and sent to plaintiff a Chronic Fatigue Syndrome Questionnaire and an Attending

---

[7] There does not seem to be any "characterization" at all in plaintiff's paragraph 19, which merely excerpts selections from the report, verbatim. If excerpting selections verbatim can be deemed a "characterization," it is an accurate one.

Physician's Statement form, which forms were different than the ones MetLife had previously sent.

After plaintiff contacted MetLife to obtain the correct forms, MetLife faxed its Fibromyalgia Initial Functional Assessment Form to Dr. Kahn, who, after seeing plaintiff on April 11, 2003, completed and signed the form reaffirming his previous, consistent diagnoses of fibromyalgia and chronic fatigue syndrome.  AR 428.  Dr. Kahn also, inter alia,  reaffirmed that "all criteria are meet" for these conditions, noted "trigger points 8/10 - level of pain," described her prognosis as poor, opined that plaintiff was unable to return to her past job, and noted that her treatment included physical therapy, pain medication and rest.  AR 428-430, 441-445.

Plaintiff's medication included Ultram 50, Modrin, Advil, Flexerill, Vicodin and Vioxx. AR 444.  Plaintiff commenced physical therapy for five sessions, but discontinued physical therapy because she could not afford co-payments for any more sessions; however, she employed "extensive use of a hot tub to relieve pain."  AR 382-410; Plaintiff's Concise Statement of Material Facts at ¶ 29.  MetLife denies that plaintiff used a hot tub extensively, since the progress note in the file states only that she used it *2 to 3 hours a day* and did stretching in the hot tub for that period.  Defendant's Response to Plaintiff's Concise Statement of Material Facts at ¶ 29. The Court resolves this factual conflict (actually, it is not a factual conflict but a battle of inferences) in favor of finding that 2 to 3 hours a day stretching in a hot tub is properly characterized as "extensive."

Plaintiff also submitted a report dated March 28, 2003 by Dr. Terence W. Starz, a rheumatologist and fibromyalgia specialist, who performed a musculo-skeletal evaluation of plaintiff, and *agreed with all previous medical diagnoses of fibromyalgia and chronic fatigue.*

8

AR 421.  Plaintiff only saw Dr. Starz on that one occasion.  Defendant's Response to Plaintiff's

Concise Statement of Material Facts at ¶ 31.  As MetLife points out, plaintiff did not follow

through on Dr. Starz suggestion of intense physical therapy, nor did she return to see him for

treatment.  *Id*.  Plaintiff explained to MetLife, in a letter received by MetLife on July 29, 2003,

AR 371-378, that she could not do PT because she could not afford the co-payments, and that in

20 years, she never had gotten any significant relief from PT (even though "I have lived in

physical therapy all of my fibromyalgia life"); however, she was able to purchase a hot tub in

March 2002, and she embarked on a daily routine of 2-3 hours in the tub doing stretching

exercises, after which she must rest, which provides her with some temporary relief which PT

never did.  She also explained, reasonably, why she was not comfortable with Dr. Starz as a

treating physician and chose not to return to him. AR 371-378.

        This Court finds that the Administrative Record in this case completely supports the

plaintiff's summary paragraph 32, which states as follows:

> Despite the facts that: (a) for over ten years Mrs. Jagielski had been
> submitting reports from her treating physicians (as well from an independent
> medical examiner [Dr. Noah]) consistently confirming a diagnosis of disabling
> fibromyalgia and chronic fatigue syndrome in accordance with the diagnostic
> criteria for those diseases; (b) there was nothing in the record to show that her
> condition had improved since MetLife first began to pay LTD; and (c) efforts
> to treat her conditions with physical therapy and medications were unavailing,
> MetLife terminated her benefits in a letter dated July 1, 2003.

Plaintiff's Concise Statement of Material Facts at ¶ 32, citing AR at 411-14.

        MetLife admits only that it terminated plaintiff's benefits by letter dated July 1, 2003, but

as to the remainder of paragraph 32, MetLife states: "plaintiff offers no support for such

statements by citation to the record and accordingly no response is required since such

allegations are nothing less than plaintiff's arguments by counsel."   Defendant's Response to Plaintiff's Concise Statement of Material Facts at ¶ 32.   At this point, the Court pauses in its recitation of facts to comment on MetLife's inappropriate response to plaintiff's paragraph 32.

The statements plaintiff makes in (a) and (c) of paragraph 32 are completely supported by references to the record facts throughout Plaintiff's Concise Statement of Material Facts.  As to (b), that "there was nothing in the record to show that her condition had improved since MetLife first began to pay LTD," the proper reference for "nothing in the record" is "nothing in the record."  What else would one reference to show that nothing exists on the record?

MetLife cleverly ducks meaningful response to this assertion with the expedient "plaintiff offers no support for such statements by citation to the record and accordingly no response is required since such allegations are nothing less than plaintiff's arguments by counsel."  The Court finds that ¶ 32(b) is not simply "argument" of  counsel; rather, ¶ 32(b) states a simple fact, namely, there is nothing on the administrative record up to and including July 1, 2003, that indicates that plaintiff's fibromyalgia or chronic fatigue syndrome ever improved.

If the factual assertion of ¶ 32(b) was untrue because there was some medical factoid or snippet in the Administrative Record showing plaintiff's condition had improved at any point of her disability, it would have been a simple matter for defendant to refute plaintiff's statement by saying "plaintiff is wrong - evidence of her improved condition exists on pages X, Y and Z of the administrative record."  Such direct contrary evidence would not only have shown plaintiff's statement in ¶32(b) to have been incorrect, it would also have offered evidentiary support for MetLife's denial of benefits.  In light of MetLife's response to ¶ 32(b), however, the only legitimate inference this Court can glean from MetLife's failure to identify any such record

10

evidence to contradict plaintiff's factual statement is that none exists.

Therefore, the Court deems defendant's response to ¶ 32(b) to be an admission that, in fact, there is nothing on the record to show any improvement in plaintiff's condition from the time she applied for LTD until July 1, 2003, when MetLife summarily terminated her benefits. In any event, this Court's review of the administrative record confirms plaintiff's assertion.  Now, back to the recitation of the facts.[8]

On July 1, 2003, Ms. Deborah Fournier-Burdick, a Case Management Specialist for MetLife who is not medically trained, sent plaintiff a four page letter, highlights of which follow:

- "Please be advised that the medical information contained in your file no longer supports the eligibility for benefits under the Verizon LTD Plan.  Therefore, your claim for LTD Plan benefits is terminated effective July 1, 2003."

- After reviewing Dr. Kahn's progress notes from February 2001 through April 11, 2003, her personal profile form of April 23, 2003, and Dr. Starz's physician office treatment notes from March 28 and April 22, 2003 -- but *not* the unequivocal IME performed by its own independent medical examiner and rheumatologist, Dr. Noah Bass, who concurred with Dr. Kahn's diagnoses, and *not* the determination of the Social Security Administration that plaintiff was disabled according to that agency's standards, even though MetLife required plaintiff to apply for said benefits and deducted the DIB from her monthly benefit without fail – Ms. Fournier-Burdick determined that the medical information contained in plaintiff's file and the more recent medical information

---

[8] In light of counsel for MetLife's repeated and flagrant obfuscation, smoke screens and "clever" couching of its statements of fact, it is ironic, to say the very least, that MetLife's brief in opposition to plaintiff's motion for summary judgment accuses plaintiff repeatedly of "lack of candor and attempts to mislead the Court." MetLife Brief in Opposition (doc. no. 49) at 8. To the contrary, the Court finds plaintiff's statements of fact to be professional, fair and straightforward recitations of facts that are supported by the record.  The same may not be said about defendant's Statements of Facts and Defendant's Response to Plaintiff's Concise Statement of Material Facts.

furnished by plaintiff at MetLife's request "does not support the existence of a totally

disabling medical condition. . . [and that] Long Term Disability for the condition of

fibromyalgia are no longer payable."

● "In summary, the medical information provided to date fails to provide clinical

documentation that the conditions render you disabled as defined by the plan."

AR 411-413.

MetLife gave plaintiff an "opportunity" to appeal this sudden termination within 180 days

by supplying, for the period from March 2002 to the present, "Physician office treatment notes,

test reports, x-ray reports, sleep study reports, psychological test reports or formal evaluation

based on a recent exam [even though plaintiff never made a claim for disability based on mental

impairments or sleep apnea or other sleep deprivation], and a list of medications prescribed and

your response to these medications." MetLife received a letter from plaintiff on July 29, 2003,

indicating, inter alia, that she was appealing its devastating and unexpected decision, and that she

would be submitting the information MetLife required in its termination letter.  AR 371-78.

On August 8, 2003, plaintiff informed MetLife that she was undergoing a sleep

evaluation and a psychological evaluation; on August 11 and August 14, 2003, plaintiff was

examined by a licensed psychologist, who noted that plaintiff had at least four "involvements

with evaluations and (psychological) treatments in the past," from 1984 through 1995, and

reported, inter alia, that she should not return to work in any form as it is not within her

capabilities to perform even minor tasks for more than twenty minutes at a time,  AR at 357-

361[9]; on September 3, 2003, plaintiff underwent an overnight evaluation for sleeping disorder

_____

[9] In her assessment and discussion, Judith McKnight Krynski, MS, Licensed
Psychologist, described a "formerly outgoing, vibrant caretaking  woman" who was isolated from
her friends, experiences great stress, is unable to do any of the activities that formerly gave her

(which concluded that she had moderately severe obstructive sleep apnea); on September 3, 2003, MetLife informed plaintiff it was requesting an additional 45 days to render its decision on the appeal; on September 24, 2003 (well within the requested 45 days), MetLife received from plaintiff the sleep study, psychological evaluation, a list of all of her medications, and a note permitting MetLife to contact Dr. Kahn if it required more information. Plaintiff's Concise Statement of Material Facts at ¶¶ 41-46. MetLife admits it received the above documentation, but it arrived too late -- although the requested 45 days had not passed, MetLife had already made its decision on September 23, 2003 upholding its termination decision, based on a review by Amy Hopkins, MD, MPH, PhD on September 22, 2003.  Defendant's Response to Plaintiff's Concise Statement of Material Facts at ¶ 46.  Although it easily could have given the additional documentation to Dr. Hopkins for a medical professional's evaluation and reconsidered its September 23rd decision in light of the additional information and evaluation, MetLife chose not to do so.

On September 22, 2003, Dr. Amy Hopkins, M.D., MPH, PhD, filed a two page report, AR 329-330, that made the following observations:

- History.  Dr. Hopkins condensed Dr. Kahn's notes from 2002 and 2003 only.  She noted that Dr. Kahn diagnosed plaintiff with fibromyalgia and CFS; that plaintiff had been diagnosed with these conditions initially in 9/83 [this date must be incorrect; Dr. Hopkins no doubt meant 9/93] and with depression and anxiety in 5/93; that "generalized pain, fatigue, trigger points, and concentration were preventing EE from RTW"; that plaintiff

─────────────────────

pleasure, including working, and that her daily struggles to cope with her chronic pain and fatigue consume her waking life and rob her of her self-esteem.  AR 360.  Dr. Krynski also opined that it does not appear to be in plaintiff's capabilities to do anything other than what she is doing, i.e., attending to her daily needs and attempting to make herself more comfortable with her chronic physical illness. *Id.*

had not seen Dr. Kahn from January 2002 to August 7, 2003 "though she was there for her '6 month check up'"; that her "tx was PT, pain medications and rest."

- History.  Dr. Hopkins spent as much time on Dr. Starz's one time evaluation, noting that Dr. Starz "believed that EE had FMS w/ no overt evidence of any underlying secondary, infectious, inflammatory, metabolic or neoplastic process"; that she had a sleep disorder and chronic fatigue, inter alia,; that he started her on Vioxx and PT but she did not find Vioxx helpful; and that she has PT in "3-4/03 for right shoulder pain" but did not show up for sessions on 3 occasions in 4/03; and that she did not want to be treated by Dr. Starz.  Dr. Hopkins did not mention that Dr. Starz had performed a musculo-skeletal evaluation of plaintiff, and agreed with all previous medical diagnoses of fibromyalgia and chronic fatigue.  AR 421.

- History.  Conspicuously absent from her discussion of plaintiff's medical history are any mention of Dr. Kahn's progress notes or assessment forms prior to 2002, and any mention of Dr. Noah Bass, the specialist to whom MetLife sent plaintiff for an IME, who concluded that plaintiff "is suffering with fibromyalgia and that she meets American College of Rheumatology criteria for this diagnosis."

Based on those few selections from the extensive medical record, Dr. Hopkins made the following observations:

<u>Comment</u>

EE is COW due to FMS/CFS. EE apparently carries a dx of FMS based on trigger points and somatic sx, though these were not actually documented in any recent office notes. Trigger points are non-specific and found in many disorders, including sleep disturbances and psychiatric disorders. No sleep evaluation was recently documented for EE's sx. No psychiatric evaluation for her EE's was recently documented, even though this is part of the differential work up for FMS and CFS. Her fatigue, sleep disturbances, generalized pain, and trigger points can all be explained on a psychiatric basis without invoking the specter of "fibromyalgia," so it is perplexing that she has not been recently referred for a mental health evaluation. EE carries dx's of depression and anxiety, but does not appear to be under the tx of a mental health professional. There was no documentation of cognitive behavior therapy being recommended despite its documented efficacy in somatic syndromes such as

14

CFS/FMS. No aerobic conditioning program was recently documented. EE was attending PT for her right shoulder, but stopped going in 4/03.

FMS and CFS are not necessarily, in and of themselves, disabling disorders, and many people who carry these dx's overall do much better when they continue to work . . . . While EE may have had many somatic complaints, there was a paucity of evidence in this record of any actual objectively determined findings which, separately or in combination, supported the presence of any specific physical impairment. This record does not objectively support EE's inability to perform the material duties of her own or any occupation on a full-time basis, without restrictions or limitations, as of 7/1/03.

<u>Recommendations</u>

No physical impairment was objectively documented which would have precluded EE from RTW, own or any occupation, no restrictions or limitations, as of 7/1/03.

AR 329-330.

A few days later, Ms. Minochka Taylor, a "Procedure Analyst," dated a letter to plaintiff on September 25, 2003, notifying her that MetLife upheld its denial of benefits on appeal.  The letter states that MetLife reviewed her entire claim file, and all of the additional documentation that she submitted as directed in its termination letter, as well as a "Physician Consultant Review" dated September 22, 2003 (i.e., Dr. Hopkins' report).  MetLife did not, however, review or discuss Dr. Bass's IME or any medical records prior to 2002. MetLife also did not even mention the determination by the SSA that plaintiff was disabled according to its rules and regulations, despite having reaped the benefits of the SSA's determination by deducting the amount of her DIB each month, without fail, from its LTD payments.  AR 272-282.

MetLife's decision was predicated on the following key factors: the recent medical updates did not provide sufficient objective support of a diagnosis of CFS or fibromyalgia; plaintiff had not been referred for a mental health examination and was not in mental health

treatment; that plaintiff was not seeking proper medical treatment because she did not treat for

the "other diagnoses that were indicated throughout the duration of your claim"; the sleep

disorder studies provided on September 24, 2003 [and obviously not reviewed by Dr. Hopkins]

were for a period after July 1, 2003, and in MetLife's view, did not show she had any disorders

prior to July 1, 2003 [as if sleep apnea happened overnight]; and, in the critical passage, the

following:

> From the review of the medical documentation, a board certified Occupational
> Medicine Physician rendered a Physician Consultant Review . . . [which] stated
> that apparently you carried a diagnosis of Fibromyalgia based on trigger points
> and somatic symptoms, though these were not actually documented in the
> recent office notes. According to the Physician Consultant, Fibromyalgia and
> Chronic Fatigue Syndrome are not necessarily, in and of themselves, disabling
> disorders, and may [sic] people who carry these diagnoses are able to work.
> The Physician Consultant stated that while you may have had many somatic
> complaints, there was a lack of evidence in this record of any actual objectively
> determined findings, which, separately or in combination, supported the
> presence of any specific physical impairment. Therefore, the Physician
> Consultant stated that the record does not objectively support your inability to
> perform the material duties of your own or any occupation on a full-time basis,
> as of July 1, 2003.

AR 183-184.

After Alternative Dispute Resolution failed, the parties submitted cross motions for

summary judgment, which is the customary practice in this district for review of ERISA benefits

decisions, accompanied by memoranda of law, statements of materials facts, and the

Administrative Record.

**III.     Standard of Review.**

**A.     Summary Judgment Standards.**

Summary judgment under Fed.R.Civ.P. 56(c) is appropriate "'if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Woodside v. School Dist. of Philadelphia Bd. of Educ.*, 248 F.3d 129, 130 (3d Cir. 2001), *quoting Foehl v. United States*, 238 F.3d 474, 477 (3d Cir.2001) (citations omitted).  In deciding a summary judgment motion, the court must "view the evidence ... through the prism of the substantive evidentiary burden" to determine "whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of the evidence required by the governing law or that he did not." *Anderson v. Consolidated Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' -- that is, pointing out to the District Court -- that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993). Thus the non-moving party cannot rest on the pleadings, but instead must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), and cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989) (*citing Celotex*, 477 U.S. at

325 (1986)). The non-moving party must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. Of Sterling, Inc.*, 142 F. 3d 639, 643 n. 3 (3d Cir. 1998), *quoting Fuentes v. Perskie*, 32 F.3d 759, 762 n. 1 (3d Cir. 1994).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)." *Marino v. Industrial Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004.) *See also Doe v. County of Centre, PA*, 242 F.3d 437, 446 (3d Cir. 2001) (court must view facts in the light most favorable, draw all reasonable inferences, and resolve all doubts, in favor of the nonmoving party ).

## B.   ERISA Standards.

A denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) of ERISA is judicially reviewed under a de novo standard "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  Where the plan grants an administrator discretionary authority to construe the terms of the plan or to determine eligibility for benefits, however, courts ordinarily may reverse the denial of benefits only if the administrator's decision was "arbitrary and capricious." *Id.* at 115.  See also *Abnathya v. Hoffman-LaRoche, Inc.*, 2 F.3d 40, 44-45 (3d Cir.1993) ("Because Hoffmann's Long-Term Disability Benefits Plan . . . gives Hoffmann, as plan administrator, the discretion to make eligibility determinations under the Plan, the district court correctly applied the deferential

arbitrary and capricious standard of review required under *Firestone Tire and Rubber Co. . . .*").

This standard of review applies to an administrator's interpretations of the language of the plan as

well as to its factual determinations. *Mitchell v. Eastman Kodak, Co.*, 113 F.3d 433, 438 (3d Cir.

1997). *Firestone Tire & Rubber Co.* further elaborated as follows:

> [W]e need not distinguish between types of plans or focus on the motivations of
> plan administrators and fiduciaries. Thus, for purposes of actions under §
> 1132(a)(1)(B), the de novo standard of review applies regardless of whether the
> plan at issue is funded or unfunded and regardless of whether the administrator or
> fiduciary is operating under a possible or actual conflict of interest. Of course, if a
> benefit plan gives discretion to an administrator or fiduciary who is operating
> under a conflict of interest, that conflict must be weighed as a "facto[r] in
> determining whether there is an abuse of discretion." Restatement (Second) of
> Trusts § 187, Comment d (1959).

*Firestone Tire & Rubber Co.*, 489 U.S. at 115.

Although courts are to apply the deferential "arbitrary and capricious" standard of review

to benefits decisions when plan administrators are given discretionary authority to interpret the

terms of the plan, where a plan or its administrator has a conflict of interest, such as where an

insurance company both determines eligibility for benefits and pays benefits out of its own funds,

the standard of review is "heightened" arbitrary and capricious review. *Pinto v. Reliance Std. Life*

*Ins. Co.*, 214 F.3d 377, 378 (3d Cir. 2000). *Pinto* "heightened" scrutiny is not a single fixed

standard but a "sliding scale" of levels of judicial scrutiny that integrate such conflicts as one

factor of many in applying the arbitrary and capricious standard.   See *Kosiba v. Merck & Co.*,

384 F.3d 58, 64 (3d Cir. 2004) (In *Pinto*, "we adopted a 'sliding scale' approach, in which

district courts must 'consider the nature and degree of apparent conflicts with a view to shaping

their arbitrary and capricious review of the benefits determinations of discretionary

decisionmakers.' *Pinto*, 214 F.3d at 393. This 'sliding scale' method 'intensif[ies] the degree of

19

scrutiny to match the degree of the conflict.' *Id.* at 379."); *Wachtel v. Health Net, Inc.*, 482 F.3d 225, 235 (3d Cir. 2007) ("In *Pinto*, we adopted a sliding scale approach to reviewing fiduciaries' discretionary acts, under which we increase our scrutiny as the fiduciary's conflicts increase.").

Where a plan is not funded by fixed employer contributions but by the employer on a claim-by-claim basis, *id.* at 388, that sort of conflict, standing alone, will place the decision near the high end of the sliding scale of judicial deference. *See, e.g., Romero v. SmithKline Beechum*, 309 F.3d 113, 118 (3d Cir. 2002). Evidence of significant conflict of interest places a case at the far end of the sliding scale, under which the court reviews the administrator's decision with a "high degree of skepticism." *Pinto*, 214 F.3d at 395.

*Pinto*'s heightened standard of judicial review is triggered not only by direct conflicts of interest but also by "demonstrated procedural irregularity, bias, or unfairness in the review of the claimant's application for benefits." *Kosiba*, 384 F.3d at 66. As Chief Judge Becker explained more fully in *Kosiba*:

> Our precedents establish at least one more cause for heightened review: *demonstrated procedural irregularity, bias, or unfairness in the review of the claimant's application for benefits.* The *Pinto* panel's decision to apply heightened review *turned almost as much on the procedures afforded to Pinto* as it did on her insurer's financial conflict of interest. See *Pinto*, 214 F.3d at 393 ("[L]ooking at the final decision, we see a *selectivity that appears self-serving in the administrator's use of [one doctor's] expertise.*"); *id.* ("[i]nconsistent treatment of the same facts"); *id.* at 394 (suggesting that "whenever it was at a crossroads, Reliance Standard chose the decision disfavorable to Pinto"). Though no case since *Pinto* appears to have turned on evidence of procedural bias or unfairness, the corresponding negative pregnant appears in several of our cases. See *Skretvedt*, 268 F.3d at 175-76 (considering but rejecting allegations of decisionmaker bias in the benefits review system); *Goldstein*, 251 F.3d at 435-36 (noting that heightened review would be required when "the beneficiary has put forth specific evidence of bias or bad faith in his or her particular case"); *Bill Gray Enters., Inc. Employee Health & Welfare Plan v. Gourley*, 248 F.3d 206, 216 (3d Cir. 2001) ( "[U]nless specific

> evidence of bias or bad-faith has been submitted, plans . . . are reviewed under
> the traditional arbitrary and capricious standard."); *id.* at 216 n.8 ("Gourley has
> failed to allege bias on the part of the plan administrator. . . .").

*Kosiba*,  384 F.3d at 66.  See also *Weinberger v. Reliance Standard Life Ins. Co.*, 54 Fed.Appx.

553, 556 (3d Cir. 2002) ("Although the fact that the decision-maker was also the insurer of the

plan may not in itself warrant application of the least deferential standard of review, see, e.g.,

*Cozzie v. Metropolitan Life Ins. Co.*, 140 F.3d 1104, 1108 (7th Cir. 1998), a 'high degree of

skepticism' is necessitated in the presence of other extrinsic evidence of bias, such as procedural

irregularities or inconsistent treatment of factual information."), quoting *Pinto*, 214 F.3d at

393-94; *Porter v. Broadspire and Comcast Long Term Disability Plan*, 492 F.Supp.2d 480

(W.D.Pa. 2007) (Ambrose, C.J., collecting cases finding procedural irregularities; in *Porter*,

district court finds procedural irregularities sufficient to invoke heightened standard based on

plan administrator's self-serving selectivity in the consideration of evidence, and obvious bias in

decision-making to the benefit of the insurer as evidenced by, inter alia, the administrator's

failure to even consider the SSA's determination that plaintiff qualified for social security

disability benefits).

        A court may not substitute its own judgment for that of the plan administrator in

determining eligibility for plan benefits under either the deferential or the heightened arbitrary

and capricious standard.  *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc.*, 298 F.3d 191, 199 (3d

Cir. 2002) (citation omitted).  Even under the "'heightened standard, a plan administrator's

decision will be overturned only if it clearly is not supported by the evidence in the record or the

administrator has failed to comply with the procedures required by the plan.' 'Whether a claim

decision is arbitrary and capricious requires a determination whether there was a reasonable basis

for [the administrator's] decision, based upon the facts as known to the administrator at the time the decision was made.'" *Pergosky v. Life Ins. Co. of North America,* 2003 WL 1544582, *8 (E.D.Pa. 2003), quoting *Smathers*, 298 F.3d at 199-200 (citation omitted).

Assuming that the claimant does not challenge the fairness of the procedures used to make a coverage determination, the Court's review of the denial of coverage decision generally is limited to the evidence that was before the plan administrator at the time of decision. *Edgerton v. CNA Ins. Co.*, 215 F.Supp. 2d 541, 548 (E.D.Pa. 2002), *citing Mitchell*, 113 F.3d at 440.

**C.   Heightened Arbitrary and Capricious Scrutiny.  A "high degree of skepticism" is triggered by demonstrable procedural irregularity, bias and unfairness in MetLife's review of the claimant's file and termination of LTD benefits.**

The Verizon LTD Plan explicitly grants discretion to the Plan to determine eligibility for benefits, which triggers the arbitrary and capricious standard of review.  Although the original Bell Plan did not appear to explicitly grant the plan administrator the discretionary authority to determine eligibility for benefits or to construe the terms of the plan, it did provide that Bell could amend the plan at any time, AR 31, which it did, and the amended Verizon Plan did grant such discretionary authority to the administrator.  Accordingly, in the absence of any conflict of interest due to a dual funding/ administration of benefits role, an arbitrary and capricious standard of review is appropriate.

However, as recited above in some detail, significant, demonstrated procedural irregularities, evident bias and inherent inconsistencies in MetLife's review of plaintiff's disability claim file and its termination of benefits for which she had been approved and which she had received for ten years, engender a high degree of skepticism and require the Court to

22

apply the heightened arbitrary and capricious standard of judicial scrutiny to its decision.  These anomalies include: almost complete disregard of any medical evidence pre 2002, all of which consistently and unanimously supported her diagnoses of fibromyalgia and chronic fatigue syndrome; complete disregard of the disability determination by the SSA, which MetLife had been only too happy to honor and apply as a deduction from plaintiff's monthly LTD benefits; complete disregard of its own specialist's IME, which supported plaintiff's treating physicians diagnoses; selected disregard of Dr. Starz's affirmation of Dr. Kahn's and Dr. Bass's diagnoses of fibromyalgia and chronic fatigue syndrome, while "cherry picking" and relying on anything in his report that MetLife could use to support its denial of benefits; MetLife's cutting short, without any good cause or even decent explanation, the 45 days within which plaintiff could submit additional documentation; MetLife's refusal to have any medical professional examine the additional documentation it received a day or two after its in-house doctor "paper reviewed" selective portions of plaintiff's medical records from 2002 and 2003; and MetLife's sudden and unexplained termination of plaintiff's LTD benefits on July 1, 2003, on the flimsy grounds that "the medical information contained in your file [that is, *the exact same medical evidence that for ten years supported plaintiff's LTD claim*, and upon which MetLife and its predecessor paid her monthly benefits] no longer supports the eligibility for benefits under the Verizon LTD Plan."

The last, but not the least, factor that compels judicial skepticism is the "finding" by MetLife's in-house doctor, Dr. Hopkins, adopted in whole by MetLife's "Procedure Analyst," that plaintiff was undeserving of LTD benefits because, although her long term treating physician and the specialist who performed the IME after physical examination concurred that plaintiff suffered from disabling fibromyalgia and chronic fatigue syndrome, Dr. Hopkins scoffed at their

diagnoses because plaintiff's "fatigue, sleep disturbances, generalized pain, and trigger points can all be explained on a psychiatric basis without invoking the specter of 'fibromyalgia'" and because "FMS and CFS are not necessarily, in and of themselves, disabling disorders, and many people who carry these dx's overall do much better when they continue to work."  Needless to say, neither Dr. Hopkins' fear of the "specter of fibromyalgia" nor the fact there may be "many people" with these diagnoses who manage to work constitute *admissible evidence* upon which a disability determination can *reasonably* be based.

Several of these items, standing alone, may be sufficiently irregular as to invoke heightened arbitrary and capricious scrutiny.  See, e.g., *Kosiba* (moderately heightened arbitrary and capricious standard of review required where, although employer was authorized and had the right to demand an IME, "the circumstances under which Merck made this request *necessarily raise an inference of bias*: At the time of the request, every piece of evidence in [claimant's] record -- the opinions of two doctors . . . , a consistent medical history, and an SSA determination that she was totally disabled [by sarcoidosis and fibromyalgia] -- supported her contention that she was disabled.");  *Lemaire v. Hartford Life and Accident Ins. Co.*,  69 Fed.Appx. 88 (3d Cir. 2003) (administrator's denial of benefits was subject to review under heightened arbitrary and capricious standard where its decision to affirm the denial of benefits on claimant's appeal was rendered only nine days after informing claimant that he had 60 days to submit additional medical documentation, and where it conducted only a "'self-serving' paper review of [claimant's] medical file");  *Pinto*, 214 F.3d at 393 (looking at the final decision, "we see a selectivity that appears self-serving" in the administrator's consideration of one doctor's expertise, inconsistent treatment of the same facts, and an unswerving bias toward the employer

24

who funded the Plan); *Porter* (Ambrose, C.J., collects cases, and finds procedural irregularities sufficient to invoke heightened arbitrary and capricious standard based on Plan Administrator's self-serving selectivity in the consideration of medical evidence and obvious bias in decision-making to the benefit of the insurer as demonstrated by, inter alia, administrator's failure to consider the SSA's determination of disability); *Doresy v. Provident Life and Accident Ins. Co.* 167 F.Supp.2d 846 (E.D.Pa. 2001) (administrator's decision was subject to heightened scrutiny due to procedural irregularities where administrator ignored SSA determination of disability and its "paper review" of all treating physicians' opinions that claimant suffered from fibromyalgia was given short shrift). *Cumulatively*, the procedural anomalies and substantive irregularities in MetLife's decision making process invite *great judicial skepticism* and demand application of the *least deferential* "heightened" arbitrary and capricious standard of review (i.e., short of de novo review but subject to very close scrutiny) to MetLife's termination of plaintiff's LTD benefits.

### IV.   Application of Standard.

#### A.   Traditional, Deferential Arbitrary and Capricious Scrutiny.

Even under the *most deferential* standard of judicial review, this Court does not hesitate to find that MetLife's termination of plaintiff's benefits was unreasonable, unsupportable, and arbitrary and capricious.

There is no need to belabor the point.  The items listed above that triggered heightened scrutiny suffice to show the arbitrariness, capriciousness and unreasonableness of MetLife's termination of LTD benefits and rejection of plaintiff's claim based upon her consistently diagnosed fibromyalgia and chronic fatigue syndrome.  See, e.g., *Skretvedt v. E.I. DuPont de*

*Nemours and Co.*, 268 F.3d 167 (3d Cir. 2001) (where all medical evidence supported disability, and plan administrator was unable to point to any "truly conflicting medical evidence," its decision to deny LTD was "without reason" and "unsupported by substantial evidence");

*Mitchell* (administrator acted arbitrarily and capriciously in requiring participant to provide objective medical evidence that he was unable to engage in any substantial gainful work - "Kodak argues that because Mitchell's records contain no explicit doctor's statement that "Mitchell was totally disabled as of June 26, 1989," they fail to establish that Mitchell was in fact "totally disabled" by CFS on June 26, 1989. Although it is true that the records lack such an explicit statement, we conclude that that alone does not support the Administrator's conclusion that Mitchell failed to show total disability as of June 26, 1989. . . . [T]here is no 'dipstick' laboratory tests for chronic fatigue syndrome"); *Lemaire,* 69 Fed.Appx. 88 (administrator's insistence that participant provide objective medical evidence to establish etiology of chronic fatigue syndrome was arbitrary and capricious; "To require 'objective' medical evidence to establish the etiology of chronic fatigue syndrome, which is defined by the absence of objective medical evidence, *Mitchell* . . ., creates an impossible hurdle for claimants and is arbitrary and capricious under the heightened standard we apply in this case."); *Porter*; 492 F.Supp.2d at 490-91 ("Broadspire's determination to terminate Plaintiff's LTDB was without reason and arbitrary and capricious" where, "beyond [the Court's] comprehension," Broadspire required claimant to demonstrate that her multiple sclerosis "had worsened" and its paper review of the medical evidence gave the treating physician's diagnoses and the SSA decision little or no weight);

*Doresy*, 167 F.Supp.2d at 856-57 ("The medical reviews conducted by Provident were incomplete and disregarded the substantial evidence of disability [on the basis fibromyalgia"] as

submitted by plaintiff's treating physicians. The vocational consultant's evaluation inadequately assessed plaintiff's ability to return to her job. Furthermore, the FCE and the surveillance tape provide no support for Provident's finding of no disability.  For these reasons, Provident's denial of plaintiff's benefits is simply not supported by reason.  Even when viewed in the light most favorable to the defendant, Provident's denial of Dorsey's claim is arbitrary and capricious, there is no genuine issue of material fact, and the plaintiff is entitled to judgment as a matter of law.").

**B.      Heightened Arbitrary and Capricious Scrutiny.**

It goes without saying, therefore, that under the heightened arbitrary and capricious standard of judicial review which the Court finds to be have been triggered by procedural irregularities and MetLife's evident bias and highly selective, one-sided review of the claim file, MetLife's decision must be reversed.

**V.      Remedy.**

Plaintiff requests the Court to award retroactive benefits, with interests and attorneys fees, and to make a declaratory judgment that plaintiff's disability is permanent and award a measure of damages for future disability benefits in a lump sum.  The Court certainly agrees that retroactive benefits with interest is an appropriate remedy in this case, as is an award of attorneys fees, but will not enter a lump sum award for "front disability benefits."

As far as attorneys fees, under ERISA, 29 U.S.C. § 1132(g)(1), the Court may, in its discretion, award attorney's fees to a prevailing party. There is no presumption that a successful plaintiff should automatically receive attorney's fees. *Ellison v. Shenango, Inc. Pension Bd.*, 956 F.2d 1268, 1273 (3d Cir. 1992); *McPherson v. Employees' Pension Plan of American Re-Insurance Company, Inc.*, 33 F.3d 253, 254 (3d Cir. 1994).

In determining whether to award attorney's fees under section 502(g)(1), a district court must consider the following five factors: (1) the non-prevailing party's bad faith or culpability; (2) the ability of the non-prevailing party to satisfy an attorney's fee award; (3) the deterrent effect of an attorney's fee award on the non-prevailing party; (4) the benefit conferred on the members of the pension plan as a whole; and (5) the relative merits of the parties' positions. *Ursic v. Bethlehem Mines*, 719 F.2d 670, 673 (3d Cir. 1983). Factors 1-3 and 5 all weigh heavily in favor of an award of attorneys fees in this case, and factor 4 is a non-factor. The Court therefore determines that plaintiff is entitled to attorneys fees for *all* of their work on this case.

Plaintiff has submitted her calculations of past owed and future disability benefits and interest as Exhibit A to her Brief in Support of Summary Judgment (doc. no. 40). As of June 2007, the amount of back benefits due under the Plan was $35,232, plus interest of $4,674.35 at the rate of 6%. Defendant does not contest the right to back benefits and interest as an appropriate remedy, nor does it submit an alternative calculation. The Court will enter judgment in favor of plaintiff, therefore, in the amount of $39,906.35, for back benefits and interest through June 2007.

Additionally, the Court will direct defendant to resume monthly LTD benefits to plaintiff effective retroactively to July 1, 2007, and will direct plaintiff to submit a petition for attorneys fees and supporting affidavit in accordance with the standard practices in this Court, and defendant will be given an opportunity to respond and to be heard at a hearing on attorneys fees.

Regarding plaintiff's novel remedy that the Court declare her eligible for LTD benefits for life and enter a lump sum award of "front benefits" (which plaintiff calculates to be $146,767.58 when reduced to present worth), the Court knows of no authority that would support

28

such an award.  Moreover, this Court cannot say on the record before the Court, as a matter of

law, that Ms. Jagielski's currently disabling conditions of fibromyalgia and chronic fatigue

syndrome will always remain so, and are incapable of improving to the point where she could

return to the work force.  If her medical evidence showed that plaintiff's condition does

substantially improve, then under the terms of the Verizon Plan,[10] MetLife might be able to

demonstrate that plaintiff was no longer disabled.

   However, MetLife's termination of benefits in this case was so unfounded and

unreasonable that this Court will not permit it to terminate benefits unilaterally at some future

date.  In the event MetLife determines, from reliable medical evidence, that it is no longer

obligated to pay LTD benefits because plaintiff's condition has improved to the point where she

is able to work, it may petition this Court to reopen this case to consider its determination.

   For all of the foregoing reasons, plaintiff's motion for summary judgment will be granted,

and defendant's motion for summary judgment will be denied.  An appropriate order will be

entered.


             s/ Arthur J. Schwab
             Arthur J. Schwab
             United States District Judge


cc:  All counsel of record listed on ECF

---

[10]   The Verizon Plan provides that "you can continue to receive LTD benefits until you no longer qualify as disabled under the Plan or you die."